IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| REGINALD H., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV734 |
| | ) | |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Reginald H. ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on June 29, 2022, alleging a disability onset date of December 15, 2019. (Tr. at 18, 252-272.)[1] On June 29, 2022, Plaintiff also filed an application for Disability Insurance Benefits ("DIB") under Title II of the Act. (Tr. at 18, 273-76.) However, Plaintiff later amended both his alleged onset date and protective filing

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

date to October 27, 2021.[2] (See Tr. at 18-19, 82-93.) Because the amended onset date falls after Plaintiff's date last insured for purposes of DIB, he was no longer potentially entitled to a period of disability under Title II, and his claim for DIB was therefore dismissed prior to his disability hearing. As for Plaintiff's SSI claim, his application was denied initially (Tr. at 106-14, 150-55) and upon reconsideration (Tr. at 125-33, 168-71). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 172-73.) On May 9, 2024, Plaintiff, along with his attorney, attended the subsequent telephonic hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 18, 41-78.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 35), and on June 11, 2025, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the

[2] Plaintiff had previously filed a claim for DIB and SSI in 2020, and a prior ALJ decision was entered on August 31, 2021 denying that claim. (Tr. at 82-93.) The Appeals Council affirmed, and Plaintiff did not appeal. Therefore, the prior decision covered the period through August 31, 2021, and Plaintiff amended his Alleged Onset Date for the present claim to October 27, 2021. (Tr. at 307.)

correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since October 27, 2021, his amended alleged onset date and revised protective filing date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 21.) At step two of the sequential evaluation process, the ALJ determined that Plaintiff suffered from the following severe impairments:

> Schizophrenia; psychotic disorder; and depression[.]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

(Tr. at 21.) The ALJ determined at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 22-24.) She therefore assessed Plaintiff's RFC and determined that Plaintiff could perform a full range of work at all exertional levels, but with the following, non-exertional limitations:

> [Plaintiff] can understand, remember and carry out simple instructions; use judgment to make simple work related decisions; have no interaction with the general public; perform no work at a production rate or pace, such as on an assembly line or under a quota; and adapt to occasional changes in work routine or setting.

(Tr. at 24.) At step four of the analysis, the ALJ determined that all of Plaintiff's past relevant work exceeded the above RFC. (Tr. at 33.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 34.) The ALJ therefore concluded that Plaintiff was not disabled under the Act. (Tr. at 34-35.)

Plaintiff now challenges the ALJ's decision in two respects. First, he contends that, at step three of the sequential analysis, the ALJ failed to properly evaluate Plaintiff's schizophrenia under Listing 12.03. Second, Plaintiff argues that, in formulating the RFC assessment, the ALJ failed to sufficiently define the phrase "production rate or pace." After a thorough review of the record, the Court finds that neither of these contentions merit remand.

A. Listing 12.03

As set out above, at step three of the sequential analysis the ALJ considers whether any impairment meets or equals one or more of the impairments listed in the regulations at 20

CFR Part 404, Subpart P, Appendix 1. In order to satisfy a listing, a claimant must meet all of the medical criteria set out in a particular listing. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). In analyzing the evidence at step three, an ALJ is not required to explicitly identify and discuss every possible listing; however, he must provide sufficient explanation and analysis to allow meaningful judicial review of his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a disability listing. Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." Id. (citing Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986)). In reviewing the ALJ's analysis, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." Meador v. Colvin, No. 7:13-CV-214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir.2011)). Nevertheless, the ALJ's decision must include "a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." Id. If the decision does not include sufficient explanation and analysis to allow meaningful judicial review of the ALJ's listing determination, remand is appropriate. Radford, 734 F.3d at 295.

Plaintiff argues that the ALJ failed to properly consider whether Plaintiff's schizophrenia met or equaled the requirements of Listing 12.03. Listing 12.00 covers mental disorders generally, and Listing 12.03 covers "Schizophrenia Spectrum and Other Psychotic

Disorders." See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03. Under Listing 12.03, the regulations specify that a claimant can meet the listing in one of two ways. He must either meet all the criteria in paragraphs A and B of the listing or all the criteria of paragraphs A and C. Id. Accordingly, the meet Listing 12.03, the claimant must first show

> A. Medical documentation of *one* or more of the following:
>
> 1. Delusions or hallucinations
> 2. Disorganized thinking (speech); or
> 3. Grossly disorganized behavior or catatonia.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03A. To meet Paragraph B, a claimant must show

> B. Extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning (see 12.00F):
>
> 1. Understand, remember, or apply information (see 12.00E1),
> 2. Interact with others (see 12.00E2),
> 3. Concentrate, persist, or maintain pace (see 12.00E3),
> 4. Adapt or manage oneself (see 12.00E4).

See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03B; see also id. § 12.00E; and 20 C.F.R. § 416.920a(c)(3). In this context, to qualify as "marked," the individual must be "seriously limited" in their ability to function in a paragraph B area "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F(2)(d). To demonstrate an "extreme" limitation, a claimant must show that he is "not able to function in [a paragraph B] area independently, appropriately, effectively, and on a sustained basis." Id. § 12.00F(2)(e).

If a claimant meets the criteria of §12.03A but not §12.03B, he may still meet Listing 12.03 by demonstrating that he meets paragraph C of the listing. To do so, the claimant must demonstrate that

> C. [His] mental disorder . . . is "serious and persistent;" that is, [he has] a medically documented history of the existence of a disorder over a period of at least 2 years, and there is evidence of both:
>
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder (see 12.00G2b); *and*
>
> 2. Marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03C.

In the present case, at step three of the sequential analysis, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, and 12.11." (Tr. at 22.) As part of the discussion at step three, the ALJ acknowledged that Plaintiff reported "a psychotic episode in 2019, but with improvement and no reoccurrence of psychotic symptoms since starting Haldol medication in January 2020, prior to the amended alleged onset date [in October 2021], with no mood or psychosis symptoms reported during the period at issue [from October 2021 to June 2024] during mental health treatment." (Tr. at 23.) The ALJ did not specifically address paragraph A; as noted above, paragraph A is satisfied by medical documentation of delusions or hallucinations, which was presumably met by the evidence that Plaintiff had experienced a psychotic episode in 2019. The ALJ nevertheless concluded that Plaintiff had failed to meet the criteria of paragraph B or paragraph C.

First as to paragraph B, as set out above, that paragraph requires an "[e]xtreme limitation of one, or a marked limitation of two" of the listed areas of mental functioning. Here, the ALJ found that Plaintiff had only a mild limitation in understanding, remembering, or applying information, and moderate limitations in interacting with others, adapting or managing oneself, and concentration, persistence, or pace. (Tr. at 22-23.) The ALJ explained that as to understanding, remembering or applying information, Plaintiff "is able to understand, remember, and apply information well enough to live alone, drive a car, count change, and watch television", and that the medical evidence reflected that Plaintiff "did not allege any significant issues in this area and consistently demonstrated unremarkable cognitive function, including thought content, memory, fund of knowledge, alertness, and orientation, on longitudinal mental status examination." (Tr. at 22.) As to interacting with others, the ALJ noted that Plaintiff "confirmed that he is able to socialize daily, spend time with his parents and sister, go to church, and go out to eat," and that the medical evidence reflected that "he spend time with his family, as well as a friend, and consistently demonstrated unremarkable behavior, cooperation, eye contact, and mood on longitudinal mental status examinations." (Tr. at 23.) As to concentrating, persisting, or maintaining pace, the ALJ noted that Plaintiff "is able to concentrate, persist, and maintain pace well enough to live alone, care for himself, shop for specific items, count change, perform some chores, and watch some television," and that the medical evidence reflected that he "consistently demonstrated unremarkable cognitive function, including thought processes, attention, and concentration, on longitudinal mental status examination." (Tr. at 23.)

Finally, as to adapting or managing oneself, the ALJ acknowledged that Plaintiff had "difficulty handling stress and changes in routine" but nonetheless "is able to live alone and perform most daily activities." (Tr. at 23.) The ALJ also outlined the history in the medical evidence reflecting the psychotic episode in 2019 "but with improvement and no reoccurrence of psychotic symptoms since starting Haldol medication in January 2020, prior to the amended alleged onset date, with no mood or psychosis symptoms reported during the period at issue during mental health treatment . . . with no more than conservative outpatient treatment with stable medication regimen as discussed in more detail in Finding 5." (Tr. at 23.) At the fifth step, the ALJ included more detail from the medical records, noting that the medical records since the Amended Alleged Onset Date of October 27, 2021, through 2024, all reflected continuation on Haldol injections, with no side effects, no hallucinations since he started the medication in January 2020, and that he had been sober since mid-2020 and was "doing well" and "feeling fine." (Tr. at 25-26 (citing Tr. at 543, 632, 483, 593).) The ALJ noted that monthly records in 2022 and 2023 reflected that Plaintiff "consistently confirmed that he was doing well, had no problems or concerns, had no mood or psychosis symptoms, had no homicidal or suicidal ideation or hallucinations, and had fine, stable, good, or adequate mood, energy, motivation, and concentration." (Tr. at 27 (citing Tr. at 593, 571, 687, 694, 701, 708, 715, 722, 729).) Similarly, records in 2023 and 2024 "show he remained stable and his presentation unremarkable, as they confirmed [Plaintiff's] consistent reports of doing well with no current symptoms, good symptom control with Haldol medication without side effects, and no additional emergent treatment or hospitalizations, as well as confirming that [Plaintiff] maintained benign mental status with no signs of psychosis, unremarkable thought content,

memory, attention, and concentration." (Tr. at 28 (citing Tr. at 783, 786, 802, 809, 816, 823, 830, 837).) The ALJ concluded that "while the record is clear that [Plaintiff] has some symptoms related to his conditions, including a history of schizophrenia with occasional attention, task completion, sleep, social, and interest deficits, they appear to be stable, improved, and well managed with conservative medication treatment." (Tr. at 29-30.)[5]

Plaintiff does not challenge any of the ALJ's analysis regarding paragraph B, and instead contends that the ALJ failed to sufficiently address paragraph C. As to paragraph C, as set out above, that section requires (1) the "existence of the disorder over a period of at least 2 years," (2) ongoing medical treatment that "diminishes the symptoms and signs of [the] mental disorder," and (3) "[m]arginal adjustment, that is, . . . minimal capacity to adapt to changes in [the] environment or to demands that are not already part of [] daily life." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03C. The ALJ's discussion at step three reflects that the ALJ acknowledged (1) the existence of Plaintiff's schizophrenia disorder since at least 2019, and (2) medical treatment with monthly Haldol injections that resulted in improvement in symptoms since January 2020, and these findings would presumably satisfy the first two criteria of paragraph C. The ALJ nevertheless found that "the evidence fails to establish" that Plaintiff's schizophrenia met all of the paragraph C criteria of Listing 12.03. (Tr. at 23-24.)[6]

---

[5] With respect to Plaintiff's history, the ALJ also gave partial weight to the prior August 2021 decision. (Tr. at 32.) That prior August 2021 decision covered the period from 2017 to August 2021, and explained that there was a 2019 "exacerbation of [Plaintiff's] symptoms following medicinal non-compliance and substance abuse, but these symptoms were quickly stabilized with medicinal management and abstinence from substance abuse," and by August 2021, Plaintiff had been "sober for 12 months" and "doing well with all symptoms controlled." (Tr. at 86.)

[6] The prior August 2021 decision likewise concluded that Plaintiff did not meet Listing 12.03, because Plaintiff had "no more than moderate limitation in any of the 'paragraph B' criteria areas" and under paragraph C "no

Plaintiff contends that the ALJ's listing analysis fails to provide sufficient explanation and analysis to allow meaningful judicial review in accordance with Radford, 734 F.3d at 295. In particular, Plaintiff argues that he presented a fair amount of evidence demonstrating that his schizophrenia met the requirements of Listing 12.03C, and that the ALJ was required to "compare the facts of this case to the 'A' and 'C' criteria of Listing 12.03 . . . 'in the first instance' " (Pl.'s Br. [Doc. #8] at 10) (citing Radford, 734 F.3d at 296), particularly as to "[m]arginal adjustment", that is, whether Plaintiff had "minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life."

Plaintiff's contention relies entirely on a single piece of evidence, originating in an April 2023 psychiatric consultative examination by Dr. Stephen B. Sanders. Notably, Dr. Sanders summarized Plaintiff's self-reported work history as follows:

> [Plaintiff] does not work. He says that he last worked around 2019 in Atlanta, Georgia. He says he had two jobs as a welder. He says he stopped working because of auditory and visual hallucinations in 2019. He says he tried working again in 2021 in North Carolina as a welder but again experienced auditory hallucinations and quit the job.

(Tr. at 675) (emphasis added). Based on the final sentence of this passage, Plaintiff argues that he met the requirement set out in § 12.03C2, i.e., he demonstrated that he had a "minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." See also 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00G2c ("We will consider that you have achieved only marginal adjustment when the evidence shows that changes or

---

evidence of only minimal capacity to adapt to changes, as demonstrated by the above-discussed evidence concerning the mental impairment listings." (Tr. at 86-88.)

increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning."). Ultimately, Dr. Sanders opined, in pertinent part, that

> [Plaintiff] would have difficulty . . . tolerating the stress and pressure associated with day-to-day work activity. He relates he has tried to go back to work previously in the past two years but experienced auditory hallucinations when he was under increasing stress from work. . . .

(Tr. at 677) (emphasis added). Thus, Dr. Sanders expressly relied on Plaintiff's self-reports regarding an unsuccessful work attempt in 2021 as the primary, if not the only, basis for restrictions regarding Plaintiff's ability to adapt.

Had the ALJ failed to address Plaintiff's statement regarding work in 2021 and/or Dr. Sanders' opinion evidence, a challenge based on Radford may well have been appropriate. However, the ALJ in the present case not only noted this evidence, but clearly explained her rationale for discounting it. Specifically, in discussing Dr. Sanders' opinion evidence, the ALJ explained that,

> [o]verall, this opinion is only partially supported by Dr. Sanders's evaluation of the claimant since it is primarily consistent with the claimant's own allegations regarding his mental status and symptoms, such as his allegations that he recently had hallucinations and depressive episodes. . . . [I]t appears that the claimant reported to Dr. Sanders that he had tried to go back to work previously in the past two years, but experienced auditory hallucinations when he was under increasing stress from work and reported episodic depression last in the past month, which Dr. Sanders appeared to have relied upon in rendering this opinion. However, the claimant testified at the hearing that he had last worked in 2019, which would be longer than the past two years prior to the consultative evaluation. . . . Furthermore, this is not consistent with the medical evidence, which confirms that during mental health treatment throughout the period at issue and as recently as February 2024, the claimant repeatedly denied having any psychosis symptoms or hallucinations since 2020. This opinion is also not fully consistent with the other medical evidence, which confirms that the claimant consistently denied essentially all symptoms during treatment, other than very occasionally complaining of attention, task completion, sleep, social, and disinterest issues, consistently maintained benign mental status on longitudinal examinations, and received no more than conservative and stable

> treatment with Haldol. Furthermore, Dr. Sanders's opinion that the claimant would have "difficulty" with social relation[ships] and stress and pressure tolerance is vague. Thus, overall, the undersigned is partially persuaded by this opinion to the extent that it finds the claimant can only perform simple instructions and would have some limitations in his ability to interact with others and adapt or manage himself. . . .

(Tr. at 31 (emphasis added).)

The Court further notes that Plaintiff's account of working in 2021—or at any time since 2019—finds no support elsewhere in the record. Plaintiff's Work History Report, completed in August 2022, documents no work after December 2019 (see Tr. at 319-29), and his earnings records reflect no earnings after 2019 (Tr. at 291, 292). These findings, along with Plaintiff's testimony that he had not worked since 2019 (Tr. 56), provide substantial support for the ALJ's decision to discount Plaintiff's report to Dr. Sanders that he experienced increased symptoms while working in 2021.[7]

Plaintiff has not challenged the ALJ's treatment of Dr. Sanders' opinion evidence, or the overall analysis of the medical evidence at step five. As noted above, Plaintiff also has not challenged the ALJ's evaluation of the paragraph B criteria at step three, which overall reflects that the ALJ concluded that Plaintiff is "able to live alone and perform most daily activities" with "no reoccurrence of psychotic symptoms since 2019", and "no mood or psychosis symptoms reported during the period at issue" from October 2021 to June 2024, and with a condition that is "stable, improved, and well managed with conservative medication

---

[7] As part of the fifth step, the ALJ also found persuasive the opinions of the State agency psychological consultants, Dr. April Strobel-Nuss, Psy.D., and Erica Brooks, Ph.D., who found that Plaintiff had only mild limitations in adapting, and that he was "capable of adapting to routine changes." (Tr. at 30, 131.) The ALJ considered Plaintiff's allegations and ultimately found moderate limitations in adapting, and limited Plaintiff to "only adapt to occasional changes in work routine or setting." (Tr. at 30.) Although part of the analysis at the fifth step, this finding would reflect more than "minimal capacity to adapt to changes".

treatment." (Tr. at 23, 29-30.) In light of these conclusions, there is no basis to conclude that during the relevant period Plaintiff had "minimal capacity to adapt to changes" or that "increased demands have led to exacerbation of [Plaintiff's] symptoms and signs and to a deterioration in [his] functioning" for the paragraph C listing. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00G2c. Accordingly, Plaintiff has not shown "a fair amount" of unaddressed evidence demonstrating that he may meet Listing 12.03, and the ALJ sufficiently explained his assessment and analysis of the evidence. This analysis is sufficient to allow meaningful judicial review of his step three determination, and the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion.

B. Production rate or pace

Plaintiff's second contention proves equally unpersuasive. Plaintiff contends that the ALJ's failure to define the term "production rate or pace" prevents judicial review of Plaintiff's RFC assessment. (Pl.'s Br. at 10.) Plaintiff's challenge relies on the Fourth Circuit's decision in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) and its progeny. In Mascio, the Fourth Circuit explained that, where moderate limitations in concentration, persistence and pace are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would

account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted). However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff s moderate limitations in concentration, persistence, or pace in light of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)); see also Sizemore v. Berryhill, 878 F.3d 72, 80–81 (4th Cir. 2017) (rejecting the plaintiff's argument under Mascio where the ALJ relied on the opinion of the state agency psychologist that, notwithstanding

moderate limitations in concentration, persistence, and pace, the plaintiff could sustain attention sufficiently to perform simple tasks in a low stress non-production jobs with no public contact); Shinaberry v. Saul, 952 F.3d 113, 121-22 (4th Cir. 2020) (same, and noting that Mascio "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC").

In the present case, the ALJ found moderate limitations in concentration, persistence and pace, and explained that:

> The claimant alleged that he has some difficulty in this area and is not able to follow directions well or stay focused more than 15 minutes, but is able to concentrate, persist, and maintain pace well enough to live alone, care for himself, shop for specific items, count change, perform some chores, and watch some television. Turning to the medical evidence, the claimant occasionally alleged having occasional difficulty with sustained attention and task completion, but consistently demonstrated unremarkable cognitive function, including thought processes, attention, and concentration, on longitudinal mental status examination, as well as during psychological consultative evaluation other than some modest deficit in that he had slowed, but organized, mental status, as discussed in more detail in Finding 5. Thus, the undersigned finds that the claimant has a moderate limitation in this area.

(Tr. at 23.) The ALJ discussed the medical evidence at length at the fifth step, and then addressed those limitations in the RFC by concluding that Plaintiff (1) can understand, remember and carry out simple instructions; (2) can use judgment to make simple work related decisions; (3) may have no interaction with the general public; (4) may perform no work at a production rate or pace, such as on an assembly line or under a quota; and (5) can adapt to only occasional changes in work routine or setting. (Tr. at 24-30.) The ALJ explained that she specifically based these findings on a wealth of underlying evidence, including (1) the opinions of the State agency psychological consultants, April Strobel-Nuss, Psy. D., and Erica Brooks, Ph.D., whose assessments she found "generally" persuasive, (2) the prior ALJ decision

from August 2021, which the ALJ afforded "partial weight," (3) the objective medical evidence, and (4) "to a lesser extent [consultative examiner] Dr. Sanders's opinion and [Plaintiff's] allegations." (Tr. at 30-33.) In particular, the ALJ explained that the State agency consultants found that Plaintiff had "the ability to maintain concentration, persistence, and pace while performing simple, routine, repetitive tasks, have appropriate interactions, and adapt to routine changes" and "was able to perform simple, routine, repetitive tasks in a non-production, low stress, and low social demand environment." (Tr. at 30.) The opinions of the State agency consultants provide that, despite being moderately limited in his ability to maintain attention and concentration for extended periods, Plaintiff remained "capable of maintaining concentration, persistence and pace while performing [simple, routine, repetitive tasks]." (Tr. at 112, 131) (emphasis added). The consultants further explained that that Plaintiff could perform such tasks throughout an 8-hour workday so long as these tasks were performed "in a non-production, low stress and low social demand environment." (Tr. at 131.) The ALJ found that these conclusions had "good internal support" and were "generally consistent" with the record evidence including "longitudinal mental health treatment notes." (Tr. at 30.) In addition, in making their findings, both the State agency consultants and the ALJ expressly referenced and largely adopted the mental RFC assessment from Plaintiff's previous administrative hearing, which provided that

> [Plaintiff] is limited to performing only simple, uncomplicated tasks that have a reasoning level of one or two as defined in the DOT, but retains the ability to maintain concentration, persistence, and pace on such tasks for at least two hours at a time and complete an eight-hour workday without special supervision; with no required interaction with the public; in a lower stress work environment, defined as one with no rigid, inflexible production or pace requirement, complex decisions, or adaptation to frequent changes at the workstation. He is able to make simple decisions and adapt to routine changes.

(Tr. at 88; see also Tr. at 32-33, 110, 128-29.) After considering the evidence, the ALJ explained that to address the limitations, she was adopting "more vocationally specific limitations" including that Plaintiff "is only able to understand, remember and carry out simple instructions, use judgment to make simple work related decisions, have no interactions with the general public, perform no work at a production rate or pace, such as on an assembly line or under a quota, and only adapt to occasional changes in work routine or setting." (Tr. at 30.)

In a similar case, the Fourth Circuit held that substantial evidence supported a limitation to "low stress non-production jobs with no public contact." Sizemore, 878 F.3d at 80-81. Notably, in Sizemore, the Fourth Circuit found that the ALJ sufficiently addressed the Mascio concerns:

> The ALJ determined early in his analysis that Sizemore had moderate difficulties with regard to concentration, persistence, or pace, as did [State agency psychologist] Dr. King. Yet, Dr. King also made more detailed findings regarding Sizemore's "sustained concentration and persistence limitations" when assessing his mental residual functional capacity. She explained her view that while Sizemore was moderately limited with respect to his ability (1) to carry out detailed instructions; (2) to perform activities within a schedule, maintain regular attendance, and be punctual; and (3) to complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, he nonetheless "would generally be able to maintain [attention] for at least two [hours] at a time as needed to do simple, routine tasks" and was thus "mentally capable of independently performing basic, routine tasks *on a sustained basis*." (Emphasis added). [Consulting examiner] Dr. Ahsanuddin similarly concluded that Sizemore could "understand, retain, and follow simple instructions" and "show *sustained attention* to perform simple repetitive tasks." (Emphasis added). The opinions of these two doctors thus provided substantial support for the ALJ's finding that, despite Sizemore's overall moderate difficulties with concentration, persistence, or pace, he would nonetheless be able to *stay on task* while performing "simple one, two-step tasks," as long as he

> was "working in low stress non-production jobs with no public contact." Cf. Mascio, 780 F.3d at 638.

Sizemore, 878 F.3d at 80–81.

Here, as in Sizemore, the ALJ's RFC finding specifically addressed Plaintiff's limitations, and adequately accounted for Plaintiff's no more than moderate limitations in concentration, persistence, and pace. In addition, as in Sizemore, 878 F.3d at 80–81, the ALJ complied with Mascio by relying on the uncontested opinions of the State agency psychologists to support her assessment of Plaintiff's concentration, persistence, and pace limitations and ability to work with an RFC accommodating that assessment. Overall, the ALJ's discussion, the context given, and the additional limitations set out in the RFC provide sufficient explanation for the RFC limitations related to concentration, persistence, and pace.

Plaintiff does not directly challenge any of this determination and analysis. Instead, Plaintiff argues that the ALJ's failure to define the RFC limitation to "no work at a production rate or pace, such as on an assembly line or under a quota" is problematic because the ambiguity of this phrase prevents the Court from determining whether the RFC adequately accounts for Plaintiff's moderate limitations in concentration, persistence, and pace. As Plaintiff correctly notes, in Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019), the Fourth Circuit identified problems with the ALJ's analysis, including finding that the claimant "could not perform work 'requiring a production rate or demand pace,'" without giving "enough information to understand what those terms mean." Accordingly, Thomas held that, "[w]ithout further explanation," the court could not determine "whether the RFC finding—particularly the portion restricting Thomas to jobs that do not require a 'production rate' or 'demand pace'—properly account[ed] for Thomas's moderate limitations in concentration,

persistence, and pace." Id. at n.5; see also Perry v. Berryhill, 765 F. App'x 869 (4th Cir. 2019) (finding that the failure to define the term "non-production oriented work setting" precluded meaningful review); Linger v. Comm'r of Soc. Sec., No. 22-2192, 2025 WL 40548 (4th Cir. Jan. 7, 2025) (finding that the ALJ failed to discuss the claimant's ability to perform the functions for a full work day, and that "there remains uncertainty" as to a limitation to "no fast paced production requirements such as assembly line work or piecemeal quotas" that "precludes meaningful review").

However, the Fourth Circuit has regularly affirmed cases with RFCs limiting claimants to work at a non-production pace, including in Sizemore, where the Fourth Circuit found that substantial evidence supported a limitation to "low stress non-production jobs with no public contact." Sizemore, 878 F.3d at 80-81; see also, e.g., Martinez v. Berryhill, No. 3:17-CV-186, 2018 WL 709971, at *4 (W.D.N.C. Feb. 5, 2018) (reviewing and affirming RFC that limited the plaintiff to "simple routine repetitive tasks but not at a production-rate pace"), aff'd sub nom. Martinez v. Saul, 776 F. App'x 175 (4th Cir. 2019); Michaels v. Colvin, No. 3:15-CV-388-RJC-DSC, 2016 WL 8710975 (W.D.N.C. Mar. 25, 2016), (reviewing and affirming RFC that limited claimant to "work in a nonproduction pace rate"), aff'd sub nom. Michaels v. Berryhill, 697 F. App'x 223 (4th Cir. 2017); King v. Berryhill, No. 3:18CV1, 2019 WL 1317732, at *2 (W.D.N.C. Mar. 22, 2019) (affirming an RFC limitation to simple, routine, repetitive tasks "at a non-production pace"), aff'd sub nom. King v. Saul, 787 Fed. App'x 170 (4th Cir. 2019); Pepper v. Comm'r of Social Security Admin., No. 22-1381, 2023 WL 3073532 (4th Cir. April 25, 2023) (finding no manifest or fundamental error where RFC prohibited "fast-paced production rate work"). In a recent decision just this month, the Fourth Circuit similarly

affirmed an ALJ's decision and analysis that involved an RFC limiting the claimant to, *inter alia*, "unskilled, routine, and repetitive tasks performed at a non-production pace" to address a moderate limitation in concentration, persistence, or pace, finding that "[t]he ALJ's reasoning can be followed, and her conclusion clears the substantial evidence bar." Calhoun v. Comm'r of Soc. Sec., No. 24-1315, __ F.4th ___, 2026 WL 2602326 (4th Cir. Sept. 3, 2026).

Other district court cases in this circuit have considered similar contentions and upheld ALJ determinations with similar RFC limitations. See, e.g., Jessie F. v. Bisignano, No. 1:24CV995, 2025 WL 1950265 (M.D.N.C. May 28, 2025) (reviewing and affirming ALJ decision with RFC limiting the plaintiff to "no production-rate pace"); Jenna S. v. Dudek, No. 1:24CV383, 2025 WL 723609 (M.D.N.C. March 6, 2025) (reviewing and affirming ALJ decision with an RFC limiting the plaintiff to "a low stress environment with no production pace"); Shaw v. Kijakazi, No. 1:20CV581, 2021 WL 3079905, at *7 (M.D.N.C. July 21, 2021) (concluding that remand was not required where the ALJ found that the claimant could perform simple, routine, repetitive tasks but not at a "production rate pace"), recommendation adopted, slip op. (M.D.N.C. Aug. 23, 2021); Beckstrom v. Saul, No. 1:19CV746, 2020 WL 1929021 (M.D.N.C. Apr. 21, 2020) (finding sufficient basis for review for RFC limiting the plaintiff to "simple, routine, and repetitive tasks not at a production rate pace"), recommendation adopted, slip op. (M.D.N.C. May 15, 2020); Wood v. Commissioner of Social Security, 2022 WL 18635520 at *8 (W.D.N.C. Sept. 21, 2022) (upholding ALJ decision limiting Plaintiff to "routine tasks not at a production rate pace" to account for moderate limitations in concentration, persistence, and pace); Adkins v. Kijakazi, No. 3:20-00281, 2021 WL4282584 (S.D.W. Va. Sept. 21, 2021) (affirming ALJ's determination with RFC limitation to "simple,

routine tasks at a non-production rate pace"); O'Dell v. Saul, 2021 WL 1233480, at *5 (W.D.N.C. Apr. 1, 2021) ("[C]ases show that the inclusion of a 'non-production work' limitation in the RFC is not categorically reversable, but must be evaluated on a case-by-case basis to see if there is adequate explanation and substantial evidence to support the restriction.").

"Thus, Thomas and Perry 'did not create a categorical rule that failing to define certain terms constitutes a reversible error,' Taylor v. Saul, No. 3:19CV468, 2020 WL 4340536, at *6 (E.D. Va. July 27, 2020), but, rather, 'clarified that a reviewing court's ability to understand phrases such as 'production rate or pace' in an ALJ's opinion depends on the phrase's context and use,' Katherine M. A. v. Saul, No. 3:19CV649, 2021 WL 1207739, at *10 (E.D. Va. Feb. 2, 2021)." Jessie F., 2025 WL1950265 at *5.

The ALJ in this case limited Plaintiff to "no work at a production rate or pace, such as on an assembly line or under a quota." (Tr. 24.) Notably, a "production rate pace" is a phrase found in the definition of Light Work in the Dictionary of Occupational Titles ("DOT"):

> [A] job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

DOT, App'x C ("Components of the Definition Trailer"), § IV ("Physical Demands -Strength Rating"), 1991 WL 688702 (emphasis added). Similarly, the Social Security Programs Operation Manual System (POMS) Medical and Vocational Quick Reference Guide likewise explains that:

> The Department of Labor rated an occupation as light when it requires walking or standing to a significant degree, sitting most of the time while pushing or pulling arm or leg controls, or working at a production rate while constantly pushing or pulling materials even though the weight of the materials in these situations is negligible.

POMS DI 25001.001 Medical and Vocational Quick Reference Guide (emphasis added).

Thus, "production rate pace" and "production pace" are used in the DOT and the POMS to describe constant movement or engagement, and other courts have found that this additional context in the DOT provides the clarity for "production rate pace" and "production pace" that was missing from other cases. See Wood v. Comm'r, No. 1:20-cv-231-GCM-DCK, 2022 WL 18635520, at *8 (W.D.N.C. Sept. 21, 2022); Shaw v. Kijakazi, No. 1:20CV581, 2021 WL 3079905, at *7 (M.D.N.C. July 21, 2021), recommendation adopted, 2021 WL 6202788 (M.D.N.C. Aug. 23, 2021); Jessie F. v. Bisignano, No. 1:24CV995, 2025 WL 1950265 (May 28, 2025); see also Gravel v. Kijakazi, No. 5:21-CV-178-KDB, 2022 WL 3008437, at *3 (W.D.N.C. July 28, 2022).

Indeed, the Vocational Expert expressed no confusion with the ALJ's limitation to jobs not at a "production rate or pace." (Tr. at 74.) See Christopher J. v. O'Malley, 2024 WL 3400525 (M.D.N.C. July 12, 2024) (noting that "the VE here did not express any difficulty in understanding the meaning of the ALJ's preclusion of 'production pace' or 'quota-based' work in responding to the ALJ's dispositive hypothetical question" (internal citations and quotations omitted)); O'Dell v. Saul, 2021 WL 1233480, at *5-6 (W.D.N.C. Apr. 1, 2021) ("[T]he VE expressed no confusion about the hypotheticals presented during the hearing or in the interrogatory, both of which included 'non-production work' as a limitation, and Ms. O'Dell's attorney never ask for further explanation on the term."). Similarly, at the hearing, Plaintiff's

counsel did not raise any uncertainty or confusion regarding this limitation in the hypothetical questions to the Vocational Expert, and did not question the Vocational Expert regarding the meaning of the "production rate or pace" restriction. See Jessie F. v. Bisignano, 2025 WL 1950265 (M.D.N.C. May 28, 2025) ("[D]espite faulting the ALJ for not saying more about the meaning of the terms 'production pace' work or 'production-rate pace' in his decision, or his hypothetical questions to the vocational expert at the hearing before the ALJ, Plaintiff (through counsel) failed to cross-examine the vocational expert regarding the meaning of that non-production restriction, or how the three jobs the vocational expert cited adhered to that restriction."); Jenna S. v. Dudek, No. 1:24CV383, 2025 WL 723609, at *5 (M.D.N.C. Mar. 6, 2025) (collecting cases); Shaw v. Kijakazi, No. 1:20CV581, 2021 WL 3079905, at *8 (M.D.N.C. July 21, 2021) ("[A]t the hearing before the ALJ, Plaintiff failed to question the VE regarding the meaning of the phrase 'production rate pace' or how the jobs the VE cited adhered to that restriction, despite the fact that he had the opportunity (through his attorney) to cross-examine the VE."), recommendation adopted, No. 1:20CV581, 2021 WL 6202788 (M.D.N.C. Aug. 23, 2021).[8]

---

[8] Moreover, even if the ALJ erred by not providing additional explanation about the meaning of the production pace limitation, the error is harmless. See Gravel, 2022 WL 3008437, at *3 (finding "an independent reason to affirm the ALJ's decision on this point," explaining that none of the jobs the ALJ relied on at step five "involve a 'production' setting of any kind," and concluding that "the 'production' limitation was in practical effect irrelevant to the ALJ's ultimate decision and thus would be harmless error if it was error at all." (citing Shinseki v. Sanders, 556 U.S. 396, 407-10 (2009)); Jessie F., 2025 WL 1950265 at *7 ("Even assuming the ALJ erred by not providing additional explanation about the meaning of the production pace limitation, the error is harmless. None of the jobs the ALJ relied on at step five involve a production setting."). In this case, at step five, the ALJ identified jobs that Plaintiff remained capable of performing despite her impairments, including Laundry worker I, DOT code 361.684-014, and Cleaner II DOT code 919.687-014. Nothing in the DOT job descriptions for these positions suggests that the jobs in question involve "production" or "production pace" work. Thus, an alleged error is harmless. See Calhoun, __ F.4th at ___, 2026 WL 2602326 at *6 ("[W[e will not remand a case to the agency unless we not only see an error but find it harmful" and "errors in the analysis of residual functional capacity can be harmless" (internal citations and quotations omitted)).

Finally, the Fourth Circuit in Perry explained that in Sizemore, the term "non-production jobs" allowed meaningful review because of the "additional context" provided by the ALJ's explanation. As another judge of this Court reasoned:

> In [Perry], the Fourth Circuit specifically distinguished its decision in Sizemore v. Berryhill, 878 F.3d 72 (4th Cir. 2017), where it "found that an ALJ had adequately explained a[n RFC] assessment that restricted the claimant, in part, to 'non-production jobs,' " as "the ALJ in Sizemore provided additional context, explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or 'public contact,' to account for moderate limitations in [concentration, persistence, or pace]," which "descriptors helped to explain the restriction intended by the ALJ, and allowed [the Fourth Circuit] to evaluate whether that restriction adequately accounted for the claimant's limitations." Perry, [765 Fed. App'x at 872] n.1. As in Sizemore, and unlike in Perry, the ALJ here provided the necessary 'descriptors,' limiting [the p]laintiff to 'a low stress, low production environment with no rigid quota and occasional exposure to people.' Accordingly, Perry does not justify remand in this action.

Ross v. Berryhill, No. 1:17CV1145, 2019 WL 1430129, at *1 (M.D.N.C. Mar. 29, 2019) (internal parenthetical citation omitted). Likewise in the present case, to the extent Plaintiff singles out the restriction precluding "work at a production rate or pace", the ALJ provided further explanation, specifically "an assembly line or under a quota." (Tr. at 24.) In addition, that limitation is part of a larger description limiting Plaintiff to a position involving (1) only simple instructions; (2) only simple work related decisions; (3) no interaction with the general public; and (4) only occasional changes in work routine or setting. (Tr. at 24.) See Sizemore, 878 F.3d at 80–81; see also Ricky F. v. O'Malley, No. 1:23CV720, 2024 WL 4333136, at *7 (M.D.N.C. Sept. 27, 2024) ("To the extent Plaintiff singles out the restriction precluding 'production pace' work, that limitation is part of a larger description limiting Plaintiff to a position involving only "simple routine tasks and simple work related decisions" and "occasional changes in the workplace setting."). Moreover, the Fourth Circuit's decision in

Thomas involved other problems that, combined together with the lack of information regarding "production rate or demand pace", frustrated review, including that "the ALJ drew no explicit conclusions about how the claimant's mental limitations affected her ability to perform job-related tasks for a full workday," and "the ALJ did not sufficiently explain how she weighed the significant evidence related to the claimant's mental-health treatment," and "the ALJ expressed the claimant's RFC first and only then concluded that the limitations caused by claimant's impairments were consistent with her RFC." O'Dell v. Saul, 2021 WL 1233480, at *5 (W.D.N.C. Apr. 1, 2021); Thomas, 916 F.3d at 312-13. Similarly, the unpublished decision in Linger, cited by Plaintiff here, involved a multitude of other failures that, combined together, precluded meaningful review, and also involved a determination that the record did not contain substantial evidence to support the ALJ's factual determinations. See Linger, 2025 WL 40548 at *5-*6. In the present case, Plaintiff does not raise any such additional contentions. As discussed above, the ALJ provided extensive analysis of Plaintiff's abilities and how the multiple limitations in the RFC addressed any concerns, including as to the moderate limitations in concentration, persistence, and pace, with support in the medical opinion evidence, the medical record, and Plaintiff's daily activities. The Court is able to follow the ALJ's reasoning, and substantial evidence supports the determination. Accordingly, the Court finds no basis for remand.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #8] is DENIED, that

Defendant's Dispositive Brief [Doc. #12] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 28th day of September, 2026.

Joi Elizabeth Peake
United States Magistrate Judge